G. Patrick ARNOULT, Conservator of the Person and Estate of George Young Jones, Appellee,

v.

C. R. GRIFFIN, a/k/a Neil Griffin, and Elizabeth N. Griffin, Appellants.

Court of Appeals of Tennessee, Western Section.

Jan. 17, 1972.

Certiorari Denied by Supreme Court Jan. 2, 1973.

Petition to Reconsider Denial of Certiorari Denied Feb. 20, 1973.

Gerber, Gerber, Marshall, Ruleman & Lane, Memphis, for appellants.

Krivcher & Cox, Memphis, for appellee.

NEARN, Judge.

G. Patrick Arnoult, Conservator for G. Y. Jones, brought suit against C. R. (Neil) Griffin and his wife, Elizabeth Griffin, to recover from them certain inter vivos transfers made by his ward prior to Arnoult's appointment as Conservator. It was the contention of the Griffins that the transfers were gifts to them by G. Y. Jones and/or his wife, Grace Yates Jones, made out of love and affection and based on a long, close, personal friendship. The Chancellor, sitting without a jury, found for the Conservator and all transfers were set aside. The Griffins have appealed.

■ The appeal arrives in this Court accompanied by the presumption of the correctness of the Decree below, unless the evidence preponderates to the contrary. T.C.A. 27–303. If the evidence preponderates against the Decree below, it is our duty to render such Decree as the law and evidence warrant. Loftis v. Stuyvesant Ins. Co. (1965) 54 Tenn.App. 371, 390 S. W.2d 722.

The Assignments of Error are:

"1. The Court erred in finding that the appellants had not carried the burden of proof that the transfers under attack were gifts.

2. The Court erred in failing to find that a confidential relationship did *not* exist between the donors and the appellants at any time when the transfers under attack were made.

3. The Court erred in failing to find that the appellants were *not* guilty of fraud or undue influence in any case.

4. The Court erred in failing to find that the donors stood in loco parentis with respect to the appellant, Elizabeth Griffin, . . .

5. The Court erred in failing to find that the execution of the wills in May of 1968 ratified the prior gifts made to appellants."

This has been a hard fought case. The trial consumed more than a week and the Bill of Exceptions is very large. However, the Chancellor made only one written

finding of fact which is the basis of the Final Decree. That single finding of fact is:

". . . defendants, C. R. Griffin, also known as Neil Griffin, and Elizabeth N. Griffin, have failed to carry the burden of proof that the transfers received by them from Grace Yates Jones and/or George Young Jones were valid inter vivos gifts. . . ."

The Chancellor's finding of fact is many faceted in meaning and therefore requires this Court in this Opinion to detail the proof adduced below for a clearer understanding of our findings and conclusions.

In February, 1970, Neil Griffin sought the appointment of a Conservator for G. Y. Jones alleging the present physical and mental capacity of Jones. G. Patrick Arnoult, an attorney of the Memphis Bar, was appointed Conservator for the person and estate of George Young Jones (G. Y. Jones) by the Probate Court of Shelby County, on the 13th day of March, 1970. At the time of his appointment, Arnoult's ward was in his mid-eighties and was confined to the Extendicare Nursing Center in the city of Memphis. In compliance with his duties as Conservator, Arnoult made investigation of the financial affairs of his ward. From such investigation and admissions by the defendants, the Conservator learned that over a period of years there had been transfers from the funds of G. Y. Jones or joint funds of G. Y. Jones and his wife, Grace, of approximately Three Hundred Thousand ($300,000.00) Dollars in cash, and Bearer Bonds in the face amount of Sixty-Four Thousand ($64,000.00) Dollars. All of these transfers had been made to Neil Griffin and/or his wife, Elizabeth N. Griffin. Upon learning these facts and upon further investigation, the Conservator filed the Original Bill. The Bill averred the above facts and that G. Y. Jones had for extended periods of time suffered severe mental impairment. The Bill charged that the defendants:

". . . through the use of a close personal, fiduciary and confidential relationship, gained the confidence and trust of the said George Young Jones and his wife, Grace Yates Jones, and fraudulently transferred or caused to be transferred to them or procured and converted to their use large sums of money and securities belonging to George Young Jones . . . all of which the said defendants have fraudulently converted to their sole use and taken and used as and for their own."

The Answer of the defendants admitted the transfers, but denied that G. Y. Jones suffered from any mental impairment at the time of the transfers; denied a confidential relationship in the legal sense and denied any fraudulent acts. The Answer averred:

". . . that all transfers made to them [defendants] over a period of years and including some unknown to the complainant, were voluntary transfers to the defendants by the Joneses out of love and affection based on a long, close personal relationship."

Thus, we have the principal issues as joined by the pleadings.

The Final Decree in this cause was entered April 12, 1971. G. Y. Jones died on May 17, 1971, and G. Patrick Arnoult was appointed Administrator ad Litem of the estate for the purpose of continuing the litigation.

The proof shows without dispute that G. Y. Jones was a retired railroad depot agent. G. Y. Jones and his wife, Grace, lived together all of their married lives in Cordova, Tennessee. G. Y. Jones was noted in the community for his business acumen, as well he might be, for in 1968 the value of his assets approximated One Million ($1,000,000.00) Dollars in value. During earlier years Mr. Jones had made loans to those in the community secured by first mortgages. Over the years he had ac-

quired rental income property and other lands, and had saved his money. About twenty years prior to the time of the trial of this case, Jones began having business dealings with J. Boyd Maize, the owner of a real estate, mortgage banking and insurance business known as J. B. Maize & Company. One of the functions of the company was to furnish first mortgage investments to individual investors in much the same manner as large corporate mortgage banking houses furnish mortgage investments to institutional investors. Mr. Jones purchased first mortgages from Maize over the years and by agreement Maize serviced them and all income therefrom was ploughed back into the purchase of additional mortgages. In 1968 the face amount of the mortgages held by Maize for Jones' account was approximately Two Hundred Eighty Thousand ($280,000.00) Dollars. The monthly income to the account was approximately Four Thousand ($4,000.00) Dollars. In addition to the foregoing mortgage investments and real estate, Mr. Jones had sizeable cash deposits with the bank, and bonds, including municipal bonds having a face value, exclusive of interest coupons, of Sixty-Four Thousand ($64,000.00) Dollars. The Joneses had accumulated these assets, not by a miserly existence, but by living in a frugal manner. The Jones' general living expenses were paid from railroad retirement income, social security, rental income, and interest income from the municipals. Prior to the death of Mrs. Jones, the couple lived quietly alone in an unpretentious home. Their social activity usually consisted of visiting with friends or going to their church, and they exhibited no extravagant tastes.

The Joneses had no children. Grace Jones had an elderly brother, Grover Cleveland Yates, who lived near them in Cordova, Tennessee. She also had a niece who lived in Memphis, Tennessee. Cordova is about twenty-five miles from Memphis. G. Y. Jones had no blood relatives who lived near him. His next of kin were nieces and nephews, some of them of the half blood, who lived in Oklahoma, Texas, New Mexico, and California, and are often referred to in the record as "that bunch out west".

In the early years of their marriage, Mr. and Mrs. Jones were close friends with Jim Nichols and his wife, Lillian Nichols, who lived in the community. The Nichols were the parents of Elizabeth (Nichols) Griffin, defendant herein. The Nichols family and the Jones often visited in each others' home. Elizabeth Griffin therefore had known the Joneses since early childhood and came to know them quite well. The relationship was such that when Elizabeth started dating Neil Griffin, she brought him over to the Joneses' in order that they might meet him. The Griffins were married in 1954.

From 1954 to 1957 the Griffins lived in Memphis, but often visited with Mrs. Griffin's parents and the Joneses in Cordova. In 1957 Mr. Nichols died. Neil and Elizabeth Griffin returned to Cordova to live with Mrs. Nichols in order that she might not be alone on her farm. It was after this return to Cordova by the Griffins that the relationship between them and the Joneses grew in closeness. All transfers of money or property to the Griffins were subsequent to 1957.

Subsequent to 1957, the Griffins often visited the Joneses. In 1961 G. Y Jones, when 76 years of age, suffered a stroke which created a speech impediment and he was unable to properly form or articulate his words. He found it embarrassing to converse except with friends. From about this time on, the Joneses began to rely upon the Griffins for assistance and to a greater degree with the passage of time. Mrs. Jones suffered the first of a series of heart attacks in 1964. There is no real dispute over the extent of the attention given and services rendered by the Griffins to the Joneses. Without going into extended detail, the Griffins took them to the doctors, made minor home repairs for

them, and took Mr. Jones to the bank when necessary. Neil Griffin collected the rents for the Joneses on their rental property. Sometimes Mr. Jones accompanied Griffin on the rent collection tours and sometimes he didn't. As time went by the Joneses revealed more and more of their financial status to Neil Griffin and he assisted G. Y. Jones more and more in the handling of details concerning G. Y. Jones' finances. Also, the Griffins saw to the physical needs of the Joneses by running all types of errands for them whenever the Joneses were unable to do for themselves. In short, the Griffins assumed that responsibility that falls upon the shoulders of children of elderly parents. Numerous witnesses also testified to the expressions made by the Joneses of love and concern for the Griffins. Once, when Mrs. Jones was in the hospital, a nurse referred to Mrs. Griffin as Mrs. Jones' daughter. Mrs. Jones corrected the reference with words to the effect that it was her deep regret that Mrs. Griffin was not her daughter. Also, there is an abundance of testimony that the Joneses often made statements to the effect that the Griffins would be left the greater portion of their estate.

In May, 1968, both Mr. and Mrs. Jones went to see Mr. William D. Marshall, attorney, for the purpose of making wills. Mr. Marshall was the attorney for the Peoples Bank, with which institution Mr. Jones transacted his banking business. Mr. Marshall had not previously represented either Mr. or Mrs. Griffin. The Joneses executed companion wills, each leaving one-half of their estate to the other and the remainder to the Griffins. The will appointed the Griffins as co-executors. Each will also provided that in the event one spouse predeceased the other, the entire estate of the survivor would go to the Griffins upon the death of the survivor. At the time the wills were executed, the Joneses also executed instruments giving general powers of attorney to Neil Griffin.

Mrs. Grace Jones died as the result of a heart attack on October 1, 1968.

After the death of Mrs. Jones, G. Y. Jones requested to spend his nights at the home of the Griffins. For several months Jones spent his nights at the Griffin home and his days at his own home where he was taken and picked up each evening by the Griffins. In early 1969 the Griffins moved to Memphis. Mr. Jones moved with them and remained with them day and night until December, 1969, when he was hospitalized and operated on for some type of intestinal obstruction. According to defendants' proof, G. Y. Jones began to fail fast thereafter. From the hospital Mr. Jones was taken to the Griffin home where he remained a few days and was then placed in the Extendicare Nursing Home where he resided at the time of trial and until his death as aforesaid.

All of the foregoing description of circumstances is not seriously in dispute. There is no proof that the Griffins did not perform the services described or that there was any animosity between the Griffins and the Joneses. The proof is all to the contrary. It is the motive of the Griffins that is sought to be impugned by the Conservator.

The record, without dispute, shows the following transfers to either Neil Griffin or Elizabeth Griffin, or for their benefit, which the Griffins allege were gifts:

| 1962 | $ 500.00 in cash |
| 1964 | 2,500.00 by check |
| 1965 | 18,000.00 by check |
| 1965 (summer) municipal bonds; | face value approx. 64,000.00 |
| 1968 (Apr. 20) | 150,000.00 by check |
| 1968 (Apr. 24) | 50,000.00 by check |
| 1968 (Oct. 24) | 65,000.00 by check |
| 1969 (Dec. 6) | 15,000.00 by check |
| 1969 * (Dec. 7) | 3,000.00 by check |
| 1969 (Dec. 20) | 10,000.00 by check |
| 1970 (Jan. 14) | 13,000.00 by check |
| TOTAL: | $391,000.00 |

* Check was made payable to Nancy Griffin, sister of Neil Griffin.

Neil Griffin also testified to other gifts in undetermined amounts. From the record, it would appear that these other gifts were not substantial.

Since the Chancellor held that the *defendants* failed to carry the burden of showing that the transfers were valid inter vivos gifts, we must presume that the Chancellor found that a confidential relationship existed between the Joneses and the Griffins. This burden is not placed upon a donee unless such relationship exists.

We find that such confidential relationship did exist. It is evident from all of the proof, especially the defendants', that the Joneses placed the Griffins in a special position of confidence and trust. The Griffins assisted them in business affairs and acquired complete knowledge of the financial condition of the Joneses. G. Y. Jones trusted Neil Griffin to collect his rents and even entrusted him with signed blank checks to use when necessary. Further, he gave Neil Griffin almost an unlimited power of attorney. A confidential relationship must exist between the parties to such power of attorney. Not only were the Griffins trusted in financial matters, but they were also trusted to perform the physical care of the Joneses when time would render it impossible to do for themselves. It appears from the record that trust for their physical wellbeing was not misplaced. We find that a confidential relationship existed at all times from the first gift to the death of Mr. Jones. When a confidential relationship exists, the dealings between the parties must be viewed in the same light as those dealings between a Trustee and cestui. Bayliss v. Williams (1869) 46 Tenn. 440; Miller v. Proctor (1940) 24 Tenn.App. 439, 145 S.W.2d 807; Turner v. Leathers (1950) 191 Tenn. 292, 232 S.W.2d 269.

In Massey v. Pemberton (1965) 54 Tenn.App. 342, 390 S.W.2d 709, the Court of Appeals, Middle Section, quoted with approval from 12 R.C.L., page 953 (Gifts), the following rule:

"A gift between persons occupying confidential relations toward each other is, if its validity is attacked, always jealously scrutinized by a court of equity, and unless found to have been made freely, voluntarily, and with a full understanding of the facts, will be invalidated. The existence of confidential or fiduciary relations imposes upon the recipient of a gift the onus of establishing its absolute fairness."

The foregoing rule was also cited with approval by the Supreme Court of this State in Lanius v. Donnell (1968) 222 Tenn. 58, 432 S.W.2d 659.

This brings us to the real factual issues of this case: the mental competency of the donors, the true intent of the donors, and the fairness of the transfers under all the circumstances.

One of the major conflicts in the testimony was over the mental condition of G. Y. Jones at the time of the transfers. The Conservator relies strongly on the medical deposition of a neurosurgeon and neurologist who examined G. Y. Jones in March, 1963, and in the year 1969. The defendants' primary medical testimony on this issue is presented by the deposition of a general practitioner who treated Mr. Jones from sometime in the 1940's until his last visit on October 16, 1968.

The sum and substance of the neurosurgeon's testimony regarding the 1963 visit of Mr. Jones is that he found G. Y. Jones showed evidence of cerebral arteriosclerosis, spoke in a low voice, and generally communicated through his wife. That at that time Mr. Jones was not mentally incompetent but the witness thought there was "some impairment of judgment to some degree". The degree of impairment, if any, was not opined by the doctor. The doctor next saw Mr. Jones in January, 1969, and then in April, 1969. The sum and substance of the testimony surrounding the 1969 examinations is that the doctor was of the opinion Mr. Jones was mentally incompetent in 1969.

One of Mr. Jones' relatives from the west testified that when he visited Mr.

and Mrs. Jones in 1967 for about an hour, he was of the opinion that Mr. Jones was mentally incompetent. He testified that he based this opinion on the fact that Mr. Jones seemed to have a blank stare, could not articulate, and spoke through his wife, who seemed to be the only one who could understand him. He further testified that Mr. Jones just didn't appear or act like he did when he had previously seen him in 1956. This witness first saw Mr. Jones when he happened to be passing through this part of the country in 1954 and again when passing through in 1956, and the total time involved in all visits with Mr. Jones was a maximum of five and one-half hours. In other words, he had only seen Mr. Jones for a maximum of five and one-half hours in his life. We are of the opinion that because of the witness' lack of contact with G. Y. Jones and the admitted impediment in G. Y. Jones' speech, the witness' opinion as evidence of G. Y. Jones' mental capacity should be given little if any weight.

Grover Cleveland Yates, 86 at the time of trial, also testified for the complainant. Mr. Yates is the last surviving sibling of Grace Jones and her closest surviving next of kin. Mr. Yates had lived within 300 yards of the Jones home since 1921 and testified that he often visited in the home. The witness testified that Mr. Jones was mentally incompetent in 1968 and placed the approximate time at about October, 1968, when Mrs. Grace Jones died. When asked about Mr. Jones' mental condition prior to 1968, the witness generally answered with a description of Mr. Jones' failing *physical* condition. The witness gave no opinion as to Mr. Jones' mental condition prior to 1968. It must be noted that on cross-examination, the witness testified that Mrs. Jones was mentally alert until the time of her death and that she served as business advisor to Mr. Jones. Further, that Mrs. Jones was capable of giving advice.

William Wolfe, the husband of Mrs. Jones' niece, next testified for the com-

plainant. He testified that he had known the Jones since about 1954 when he began to date Louise Yates. Further, that after his marriage to Mrs. Jones' niece, Louise Yates, he often visited in the home of Mr. and Mrs. Jones. When asked about the mental competency of Mr. Jones in the year 1967, he answered:

". . . that right there towards the end before she died [Mrs. Jones], it was awfully hard to communicate with him, that she really didn't know what he wanted a lot of times, so I assumed that the communication process was very difficult with him."

When asked about Mr. Jones' mental condition in the year 1968, he testified:

"Well, of course, that's the time Aunt Grace died, and I personally don't believe Uncle George knew too much about what was going on."

Again, when the witness was asked about the mental condition of Mr. Jones in 1967, he testified that "possibly" Mr. Jones was incompetent then, but that in 1968 it was the witness' opinion Mr. Jones was incompetent.

The general practitioner who testified for defendants treated Mr. Jones since the 1940's for the minor human ailments and injuries, such as colds, cuts, etc., over the years. He saw Mr. Jones in 1959 about a throat problem; in 1962 about his speech difficulty; in 1965 twice about a shoulder problem; in 1966 about a foot injury; in March and April, 1968, about a cold and vomiting; and on October 16, 1968, for fluid in the chest. The sum and substance of the general practitioner's testimony was that Mr. Jones' ability to form his words properly became more difficult as time went on but that the doctor was able to communicate with him at all times and that at no time when he saw Mr. Jones did he consider him mentally incompetent in any way.

We deem it unnecessary in this Opinion to detail all the defendants' non-medical

proof on the mental competency of G. Y. Jones. The proof included the testimony of witnesses who had business dealings with Mr. Jones in the sale of some of his real estate holdings. The testimony of his banker. The testimony of his tax accountant. The testimony of an attorney who represented him in certain real estate sales. The testimony of the attorney who prepared the wills and power of attorney. All this testimony was to the effect that Mr. Jones had a speech impediment but was mentally competent.

We hold that the proof does not warrant a finding of mental incompetency on the part of G. Y. Jones at any time prior to the death of Grace Jones. If the Chancellor was of a different opinion, the evidence preponderates against such finding. As to Grace Jones, we have been unable to find any testimony in the record, even by inuendo, that suggests that Grace Jones was mentally incompetent or not of sound mind at any time prior to her death. All of complainant's proof and the defendants' proof is to the effect that she was a bright, intelligent, independent-minded woman until the date of her death.

■ Counsel for Conservator relies upon the case of O'Brien v. Waggoner (1936) 20 Tenn.App. 145, 96 S.W.2d 170, for the general proposition that in cases of this nature the burden of proving that the transfer was intended as a gift is on the donee. We are certainly not in disagreement with the O'Brien case on that proposition. However, we think the evidence in the instant case heavily preponderates to the view that the majority of the transfers in the instant case were intended by the donor to be gifts. Counsel for the Conservator strongly relies upon the case of Atchley v. Rimmer (1923) 148 Tenn. 303, 255 S.W. 366, for proposition that under the facts of this case the defendants have failed to carry the burden placed by law upon them. We are of the opinion that the facts of *Atchley* are readily distinguishable from those of the case at bar.

First, let us look at the principal facts of the *Atchley* case. The deceased was the owner of a certain note executed August 22, 1919. About November 1 of the same year the deceased executed his will wherein he bequeathed the note in equal shares to the defendant and another. The deceased died in July, 1920. The defendant had lived with the deceased immediately prior to his death and had access to the deceased's belongings. After the death, the defendant came up with the note in her possession claiming it had been given to her by the deceased. The Court held that mere possession of the note by the defendant raised no presumption of ownership, but that the "fact of possession is a matter to be considered along with other facts and circumstances". What were some of the other facts and circumstances of that case? The Court, in its Opinion, placed strong emphasis on the fact that just a few short months prior to his death, the deceased had made a solemn written declaration by will of just what he did desire to be done with the note. This written declaration of intent by the deceased was completely contrary to his actions as alleged by the defendant.

We also have a will of the donor in the instant case, but its terms are by no means contrary to the theory of defendants' case or the actions of G. Y. Jones. The will of G. Y. Jones provides that one-half of the estate is to go to his wife and the other half to the Griffins, unless the testator's wife predeceases him; in which event all is left to the Griffins. The Court, in *Atchley* held that the defendant's proof was insufficient to maintain the theory that the note was given to the defendant. The defendants' proof in the instant case is substantially different. *Atchley* is distinguishable on the facts.

In O'Brien v. Waggoner, supra, which is relied upon by the counsel for Conservator, the pivotal issue was one of delivery. The claimant in that case never received actual possession of the chattels which were claimed as a gift. The Court held that one

of the circumstances to be considered in arriving at the answer to the problem of whether or not a gift actually took place, was that of delivery. In that case there was no delivery and therefore no gift. In the instant case the fact of delivery is present.

It is the argument of counsel for appellee that there has been no delivery of the municipal bonds ($64,000.00) because the donor retained control of the interest coupons. It is appellee's theory that under the decisions of Brown v. Vinson (1949) 188 Tenn. 120, 216 S.W.2d 748, and Figuers v. Sherrell (1944) 181 Tenn. 87, 178 S.W.2d 629, the transfer in the instant case of the municipal bonds would not constitute a valid inter vivos gift as the donor did not surrender complete dominion and control of the gift. In the *Brown* case, four U.S. Series E Savings Bonds were delivered by Brown to the Vinsons with the pencil notation "To Letha Vinson and (Oik) Vinson. Bob Brown". After Brown's death, the administrator sought the return of the bonds. The Series E bonds stated on their face that they were not transferrable except as provided in certain government regulation and were payable only to the registered owner. The Court held that delivery of the bonds with appropriate words indicating an intention to give was not effective since it is a violation of the terms stated on the bonds and the regulations and provisions under which the bonds were issued. In the *Brown* case the Court stated:

"Moreover, since the attempted gift in such manner does not enable the intended donee to collect the debt which such a bond evidences if the United States Government elects not to respect the transaction, then complete dominion and control of the gift is not acquired by the donee as required by our rule governing gifts inter vivos, and it becomes uncertain as to who owns what with reference to the debt evidenced by these bonds."

The bonds in the instant case are "bearer" bonds. The record does not indicate that there is any requirement or condition noted on the bonds to effectuate transfer. The possessor of these bonds needs only to present them at maturity for payment. When the donor gave up possession he gave up all effective dominion and control over them. The recipient could have sold them or pledged them without any further thing being done by the donor.

In Figuers v. Sherrell, supra, the deceased had twenty-five (25) shares of stock, formerly issued in decedent's name, issued in the name of his nephew, the complainant in the cause. During the deceased's lifetime a stock dividend of 12 shares was issued in the name of the nephew. The deceased never made a physical delivery of the stock to the nephew. The deceased exercised complete dominion and control over the stocks. He forged his nephew's name to proxies. He forged his nephew's name to dividend checks and used the proceeds as his own. He even hypothecated the shares for loan purposes by again forging the nephew's name. Needless to say, the Court held that the donor had not given up dominion and control over the disputed shares of stock and no inter vivos gift had been accomplished.

■ We hold that in the instant case that when the Joneses gave the physical possession of the bonds in question to the Griffins, the complete dominion and control of the bonds were surrendered to the Griffins and such transfer constituted a valid, inter vivos gift, provided the intention to give on the part of the donor has been shown.

■ It was further the holding of the Court in *Atchley,* supra, that the testimony of a donee alone, unsupported by facts and circumstances or other corroborative evidence, would not support a finding that a transfer was a gift. This is sound law. However, in the present case there is proof of other facts and circumstances which would support the testimony of the donee and the overheard statements of the donor.

■ Without discussing each case cited in the Briefs, we would state that we understand the law to be that there is no "magic" single circumstance, the presence of which or the lack thereof, which will irrevocably determine whether a transfer was a gift, theft by fraud, loan, or whatever. The nature of the transfer is to be determined by all the circumstances. This is not to say that there are no necessary elements of a valid gift, but it is to say that the existence of these elements is found by an examination of all the circumstances involved.

■ In Dodson v. Matthews (1938) 22 Tenn.App. 49, 117 S.W.2d 969, it was held that in order to constitute a completed and irrevocable gift, inter vivos, there must be: (1) an intention on the part of the donor to make the gift, and (2) the intention must be accompanied by delivery. We have found that there was a delivery. Now, as to the issue of intent, it must be determined from all the circumstances. It is almost, if not completely, uncontroverted that the Joneses had great affection for the Griffins. Mr. Jones was a near millionaire. The Joneses had no children. The Griffins tended to the needs of the Joneses. The Griffins manifested a great concern for the welfare of this old couple. We do not think it unnatural that Mr. and Mrs. Jones would desire to give away during their lifetime a part of their wealth to those they loved in order to witness the donees' appreciation and receive their thanks and affection while alive, rather than trust to viewing it from another world after they are dead. Neither do we think it necessarily sinister that such gifts be accepted. However, there can be no overlooking the fact that the transfers are large in amount. Yet, their amount must be viewed in the light of the circumstance of the overall wealth of the donor, the manner and the source of the gifts. If the gifts had the effect of pauperizing the donor, it would, in our view, create an almost insurmountable presumption that the transfers were invalid. But that is not here the case. Let us look to the largest transfer: the Two Hundred Thousand ($200,000.00) Dollar transfer of April, 1968.

Quite some time prior to 1968 the Griffins had acquired land located on Lamar Avenue in the City of Memphis. It was their desire to erect a motel thereon. The Griffins had made known their plans to the Joneses. Due to the fact that the Griffins had no connections with any of the large motel chains (it seems they had no desire for a "franchise" type operation), the Griffins were encountering difficulties in the financing of the project. The Joneses were aware of the motel plans and the difficulties involved. It was the testimony of the defendants that one day the Joneses called them over to tell them that they had figured a way to give them the Two Hundred Thousand ($200,000.00) Dollars needed to construct the motel. Griffin testified that Jones' plan was to obtain the funds from J. B. Maize & Co. secured by the mortgages being collected by Maize. Maize was contacted about the matter, but was unable to loan the money. Griffin then contacted the Peoples Bank and a One Hundred Fifty Thousand ($150,000.00) Dollar loan to Jones was agreed upon secured by the mortgages held by J. B. Maize and the Griffin property on Lamar Avenue. The banker testified that the bank expected the loan to be repaid from the note income collected by Maize and did not look to the Griffins for payment. The income from the Maize notes exceeded the quarterly payments to be made on the Peoples Bank note. It must be borne in mind that Jones never used the Maize note income for living expenses. That income was always used to purchase other notes by Maize. Therefore, the effect of the transaction was that Jones pledged his note income, which he never used except for reinvestment, for the payment of the One Hundred Fifty Thousand ($150,000.00) Dollar note. The result was that the One Hundred Fifty Thousand ($150,000.00) Dollars was obtained by the use of Jones' future investment income

which in no way affected the personal use income of the Joneses. Mrs. Jones signed the check for the additional Fifty Thousand ($50,000.00) Dollars needed to build the motel and there has been no question raised as to her mental competence. The additional Fifty Thousand ($50,000.00) Dollars did not near bankrupt the Joneses.

The next largest transfer in size is the Sixty-Four Thousand ($64,000.00) Dollars in municipal bonds. These bonds, according to the testimony, did not mature until about the beginning of the next century. In view of the age of the donors, we do not think it unwarranted to presume that they were of the opinion that they would not be here to collect the principal amount of the bonds at maturity. The Griffins testified that they were given the bonds and their physical custody, but not the income therefrom. The Joneses were to retain the income and from the proof, they did. Because of the late maturity of the bonds, the income therefrom was all that the Joneses could reasonably hope for. The upshot of the transfer is that the Joneses transferred to the Griffins that which the Joneses could never live to collect or use. This transfer in no way depleted the donors' personal use income. All of the transfers accomplished either prior to or after Mrs. Jones' death had no effect on the personal use income of the Joneses or in any way altered their manner of living. The worst that can be said of all the transfers is that Mr. Jones was left a half-millionaire instead of a millionaire.

There are yet additional circumstances which lead us to the conclusion that the transfers were intended to be gifts. Practically every disinterested witness who testified and who knew the parties was not surprised over the fact that gifts had been made by the Joneses to the Griffins. The witnesses expected such to be the case in view of the statements of the Joneses of the love and affection they had for the Griffins. Furthermore, the banker who closed the One Hundred Fifty Thousand ($150,000.00) Dollar loan was never led to believe by any of the parties that the transaction was to be in effect a loan from the Joneses to the Griffins. In all fairness, we must state that neither was the banker advised that it was a gift. But, we think the absence of any mention that the Joneses considered the One Hundred Fifty Thousand ($150,000.00) Dollars to be a loan to the Griffins is an additional circumstance to be added up with the rest.

Therefore, we find that the transfers made prior to the demise of Mrs. Jones were intended to be gifts. If the Chancellor was of a different mind, we hold that the evidence preponderates to the contrary.

In Turner v. Leathers, supra, the Supreme Court discussed the necessity of proof of proper independent advice to the donor prior to the transfer, in order to sustain a transfer between parties occupying a confidential relationship. The rule of independent advice was stated as follows:

"Proper independent advice in this connection means that the donor had the (preliminary) benefit of conferring fully and privately upon the subject of his intended gift with a person who was not only competent to inform him correctly as to its legal effect, but who was furthermore so disassociated from the interests of the donee as to be in a position to advise the donor impartially and confidently as to the consequences to himself of his proposed benefactions. Post v. Hagan, 71 N.J.Eq. 234, 243, 65 A. 1026, 1027, 124 Am.St.Rep. 997; Slack v. Rees, 66 N.J.Eq. 447, 59 A. 466, 69 L.R.A. 393; Roberts v. Chase, 25 Tenn.App. 636, 166 S.W.2d 641; Peyton v. William C. Peyton Corp., 23 Del.Ch. 321, 7 A.2d 737, 123 A.L.R. 1482."

The rule was followed by that Court in the more recent case of Lanius v. Donnell, supra. In Miller v. Hubbs (1955) 199 Tenn. 237, 285 S.W.2d 527, the Supreme Court held that the rule of proper independent

advice was met when one spouse had the advice of another.

In the instant case, Mr. and Mrs. Jones lived together during their married lifetime, but apart from the Griffins. They were not all under the same roof where the opportunity for undue influence is greater and there exists a lesser opportunity for the uninfluenced quiet consideration of one's acts. There is no proof that Mrs. Jones was in the least weakminded and at least one transfer bears her signature. All the proof is that she advised with her husband on his acts. Furthermore, Mr. Jones' tax accountant testified that Mr. Jones had made inquiries of him as to the best method to avoid estate taxes on his estate. Also, Mr. Henry Beaty, attorney, testified that Mr. Jones put the same query to him when he was closing a real estate deal for Mr. Jones. Both Mr. Beaty and the tax accountant advised Mr. Jones that the surest way to avoid estate taxes was to give away his wealth before death. This advice was rendered to Mr. Jones when he was alone with his advisors and not ordinarily subject to any undue influence. It is evident that Mr. Jones acted upon the advice. We hold that in this case the rule of proper independent advice has been met by clear convincing evidence.

■ We have therefore found that: (1) the transfers complained of prior to the death of Mrs. Jones were gifts, (2) made while the donors were mentally competent, (3) but during the existence of a confidential relationship between the donors and the donees, (4) that the donors had independent competent advice, and (5) the transfers were fair and not unnatural. We hold the defendants have carried the burden of proof of the validity of gifts made prior to the death of Mrs. Jones by the preponderance of the evidence and such is clear and convincing.

As to the transfers made after the death of Mrs. Jones, we hold that the defendants have not shown the absolute fairness of those transfers. It was the defendants' contention that after the death of Mrs. Jones, Mr. Jones had told them that if that "bunch from out west" tried to get his money to "clean out" his bank account. That after Neil Griffin petitioned for a Conservator for Mr. Jones, and upon notice thereof being sent to the "bunch from out west", certain inquiries were made by the western relations about the size of Mr. Jones' estate. Thereupon, as previously instructed by Mr. Jones, Neil Griffin, "cleaned out" the checking account. Later, on advice of counsel, he redeposited the funds. These transfers must fail. First, because the record is not clear whether it was the intention of the donor that the funds so transferred were intended to be a gift or merely secreted from his relatives. Second, at the time the alleged instructions were given, Mrs. Jones had died and we think all the proof shows that the death of Mrs. Jones was a great mental shock to Mr. Jones, from which he never completely recovered. Third, the transfers were made when Mr. Jones had no opportunity for proper independent advice. There is no proof that at any time anyone advised Mr. Jones that the "clean out the account" procedure was a proper one to follow.

So much of the first and controlling Assignment of Error consistent with this Opinion is sustained. The Decree of the Chancellor is set aside.

A Decree will be entered in this Court awarding judgment against the defendants Griffin for all sums transferred to them subsequent to October 1, 1968, less those sums heretofore returned to the Conservator by the Griffins on advice of counsel. The judgment shall bear interest from the date of the filing of the Original Bill in this cause. All transfers made previous to October 1, 1968, are decreed to be valid inter vivos gifts.

Costs below and costs of appeal are adjudged against the estate of G. Y. Jones.

The cause will be remanded to the Chancery Court of Shelby County for enforcement of the Decree and for any further proceeding not inconsistent with this Opinion.

CARNEY, P. J., and MATHERNE, J., concur.