IN THE COURT OF APPEALS OF TENNESSEE
AT JACKSON
AUGUST 21, 2008 Session

## MUHAMMAD ZIYAD v. ESTATE OF WILLIAM B. TANNER, SR.

**Direct Appeal from the Probate Court for Shelby County**
**No. C-13142      Karen D. Webster, Judge**

_____

**No. W2007-01683-COA-R3-CV - Filed November 6, 2008**

_____

This appeal involves a claim against a decedent's estate for one million dollars. The probate court denied the claim on various grounds, and we affirm.

**Tenn. R. App. P. 3; Appeal as of Right; Judgment of the Probate Court Affirmed**

ALAN E. HIGHERS, P.J.,W.S., delivered the opinion of the court, in which DAVID R. FARMER, J., and J. STEVEN STAFFORD, J., joined.

Michael F. Pleasants, Memphis, TN, for Appellant

William Ernest Norcross, Alisa L. Simmons, Cordova, TN, for Appellee

**OPINION**

### I.   FACTS & PROCEDURAL HISTORY

William B. Tanner ("the Decedent") died on December 1, 2005. The probate court of Shelby County admitted the Decedent's will to probate on December 5, 2005. The Decedent's will was dated October 6, 2005. It listed various bequests to the Decedent's daughters, and the remainder of the estate was devised to the Decedent's spouse. Muhammad Ziyad, the appellant, had signed the will as an attesting witness.

The Decedent's brother, Herbert Tanner, subsequently filed a complaint to contest the will, alleging that it was not properly attested and executed. He attached the affidavit of Mr. Ziyad, who stated that he did not actually witness the Decedent or the other attesting witness sign the will, despite the statements to the contrary in his witness affidavit. Herbert Tanner submitted a previous will from 2004, which provided that Herbert would receive $10,000 per month until his death and a new Cadillac.

On March 24, 2006, Muhammad Ziyad filed a verified claim against the Decedent's estate for one million dollars. The basis for the one million dollar claim was listed as "Promise/Pledge to Muhammad Ziyad." Attached to the claim was a photocopy of a letter allegedly written by the Decedent, which provided:

8/20/05

To: Muhammad Ziyad

I appreciate the times that you were here by my side helping me thru these times of great need. You have always been there for me as a friend whenever i [sic] have needed you.And you have never ask me [sic] for anything.God only knows whether I will make it through these trying times,if I do I want to ask him to help me to help you with your life and your business involvements.I am going to give you a million dollars if I live.And in if [sic] God wills that I go the the [sic] next world with Jesus Christ I want you to have a million dollars in cash and value from my estate.If God wills that I go to the next world from this illness,I want you to make sure that my daughter Crystal is OK.I know that Pat will take care of Weatherly. You have been and are indeed a sterling friend. Thanks for always being here for me through thick and thin.

/s/ William B. Tanner

The text of the letter had been typed, and the Decedent's signature was photocopied like the rest of the letter.

The Decedent's wife, as executor of the estate, filed an exception to Mr. Ziyad's claim, contending that the claim was invalid for various reasons. The probate court held a two-day bench trial on the matter. During opening statements, Mr. Ziyad's attorney clarified that he was not claiming that the August 2005 letter was testamentary. Instead, he explained, "[w]hat's before the Court, if Your Honor please, is a contract, a very special contract, a very unusual contract. Our claim is bounded in contract."

Mr. Ziyad testified that he had a "special contractual arrangement" with the Decedent throughout their "30-year association." Mr. Ziyad testified that he first met the Decedent in 1975 when he sought advice from the Decedent regarding marketing and advertising issues. Mr. Ziyad explained that his business promotes the Miss Black Memphis Pageant, and he sought the Decedent's advice because he thought that the Decedent was an expert on advertising and promotions. Mr. Ziyad testified that over the next few years, he and the Decedent developed a spiritual connection, as well as a "special business association." Mr. Ziyad described himself as the Decedent's "prayer partner,"stating that he would pray with the Decedent, read passages from scriptures, write him letters, and "inject spiritual inspirational information" into their relationship. He described himself as a "business associate" of the Decedent through the Decedent's billboard company.

Mr. Ziyad testified that the basis of his one million dollar claim against the Decedent's estate was an oral "agreement" he reached with the Decedent in 1985, in which the Decedent stated,[1]

> I appreciate everything that you are always doing for me. And I want you to continue doing these things and being available when I need you. And, you know, if you keep on being available and doing the things that I need you to do, then one day I'm going to give you a million dollars.

Mr. Ziyad testified that the agreement was confirmed to him "off and on" throughout the next twenty years, and he performed various services for the Decedent until the Decedent's death in 2005 "in the expectation that [he] would be rewarded for so doing."

Mr. Ziyad said his relationship with the Decedent was predominately of a spiritual nature, and he said he expected to be rewarded for providing spiritual counseling to the Decedent. In addition, Mr. Ziyad testified that he would, "from time to time," deliver envelopes to various businesses for the Decedent, and he would sometimes "run other errands" such as going to the health food store for the Decedent, or bringing him pizzas. Mr. Ziyad said he "ran a few errands concerning some billboard matters" for the Decedent's business, such as riding around with the Decedent on weekends to look for obstructed signs and going to speak with some customers who complained about the billboards. However, Mr. Ziyad reiterated that "[t]he spiritual advisor role was the most significant of all of the business involvements that I took care of for Mr. Tanner." Before the Decedent died, he was in and out of the hospital for three to four years due to leukemia. Mr. Ziyad testified that he would visit the Decedent at the hospital, pray with him, go cash checks for him, and refill the candy jar the Decedent maintained in his room for the nurses. Mr. Ziyad stated that when the Decedent's condition worsened in 2005, he would visit the Decedent every day for approximately four hours, pray with him, help him with exercises, straighten up his hospital room, and get business files out of a drawer for the Decedent.

Mr. Ziyad testified that during one of his visits to the hospital, the Decedent gave him the aforementioned letter, dated August 20, 2005. According to Mr. Ziyad, the letter embodied their oral agreement from 1985. Mr. Ziyad testified that he understood the letter to mean that the Decedent

---

[1] Near the beginning of Mr. Ziyad's testimony, counsel for the estate objected to Mr. Ziyad testifying about "any statements that Mr. Tanner may or may not have made, under the dead man statute," Tenn. Code Ann. § 24-1-203 (2000), which provides:

> In actions or proceedings by or against executors, administrators, or guardians, in which judgments may be rendered for or against them, neither party shall be allowed to testify against the other as to any transaction with or statement by the testator, intestate, or ward, unless called to testify thereto by the opposite party.

The trial judge stated that "the dead man statute in and of itself will control at this hearing. The Court will also limit that to transactions that were performed [and] statements that were made regarding those transactions. . . . [A]s it gets into specific relationships and transactions that pertain to Mr. Tanner, the Court will not allow that testimony." However, Mr. Ziyad testified about this statement without objection.

would pay him one million dollars "if he lived or if he died." Mr. Ziyad testified that he only had a photocopy of the letter, and he never saw an original copy of the letter bearing the Decedent's original signature. However, Mr. Ziyad testified that he was familiar with the Decedent's signature and that the signature on the letter was the Decedent's signature.

The letter mentioned two of the Decedent's daughters, Crystal and Weatherley, stating, "If God wills that I go to the next world from this illness,I want you to make sure that my daughter Crystal is OK. I know that Pat [the Decedent's wife] will take care of Weatherly." Mr. Ziyad testified that, since the Decedent's death, he had visited Crystal to "make sure she's all right," and once he met her at an attorney's office at her request. On cross-examination, Mr. Ziyad acknowledged he had never been inside Crystal's home.

Mr. Ziyad said he never asked for payment for his services during the Decedent's lifetime because he knew that the Decedent had "promised" him one million dollars. Mr. Ziyad testified that he called the Decedent's wife, Pat Tanner, after the Decedent's death to ask her about receiving the sum of one million dollars. According to Mr. Ziyad, Mrs. Tanner told him, "you wouldn't believe the stories that I have heard from people," but she said she could believe that the Decedent would want Mr. Ziyad to have one million dollars. Mr. Ziyad testified that Mrs. Tanner told him she would know more about the Decedent's estate in a few months. Mr. Ziyad said he never told Mrs. Tanner that he had a letter from the Decedent regarding the agreement because he thought she already knew about it.

Mr. Ziyad presented the testimony of the Decedent's brother, Herbert Tanner, who testified that Mr. Ziyad and the Decedent had "a very close, warm relationship" and "visited a lot throughout the years." He said Mr. Ziyad and the Decedent were prayer partners, and that the Decedent would call Mr. Ziyad from time to time whenever he needed his assistance. Herbert Tanner testified that he visited the Decedent in the hospital almost daily, and he often saw Mr. Ziyad there. Herbert Tanner said the Decedent told him he intended to reward Mr. Ziyad for his services, and he said the Decedent wanted Mr. Ziyad to have one million dollars because he loved Mr. Ziyad as his best friend.

Next, Mr. Ziyad presented the testimony of his nephew, Quantral Fletcher. Mr. Fletcher testified that he and Mr. Ziyad met the Decedent at a Wendy's in September of 2005. Mr. Fletcher testified that he overheard the Decedent tell Mr. Ziyad, "I'm going to do what I promised about the million dollars."[2] Mr. Fletcher said the Decedent also told Mr. Ziyad he needed him to "keep helping him as he was in and out of the hospital" and "look after his daughter, Crystal" if anything happened to him.

Mr. Byron Jordan testified that he was a nurse at the hospital where the Decedent received care for several years, and he saw Mr. Ziyad numerous times visiting the Decedent. Mr. Jordan explained that the Decedent continued to conduct business in his hospital room as if it were an

---

[2] The probate court overruled an objection to this testimony based on hearsay and the dead man's statute.

office, and Mr. Ziyad was sometimes present when the Decedent was conducting business. However, he never observed the Decedent ask Mr. Ziyad to assist him with anything business-related, and he was not aware of any business relationship between Mr. Ziyad and the Decedent. Mr. Jordan said the Decedent referred to Mr. Ziyad as "just a friend of his," whom he would call to do things for him.

Mrs. Pat Tanner testified she was married to the Decedent for almost 30 years, and she was involved with all of the Decedent's various businesses. She testified she knew Mr. Ziyad because she had "seen him in passing" at one of the Decedent's offices during the past two to three years, usually around Christmastime. Mrs. Tanner testified that Mr. Ziyad was not involved in any way with the Decedent's billboard business, and she testified that, to the best of her knowledge, he was not involved in any business or contractual relationship with the Decedent. Mrs. Tanner also said she was not aware of any involvement of Mr. Ziyad with the Decedent's daughter, Crystal. Mrs. Tanner testified that Mr. Ziyad called her a few days after the Decedent's death and told her that the Decedent wanted him to have one million dollars. According to Mrs. Tanner, she told him she had "absolutely no knowledge of anything like that," and there was nothing in the Decedent's records to indicate that Mr. Ziyad was to receive one million dollars. Mr. Ziyad did not mention having a letter from the Decedent about the agreement.

Mrs. Tanner also testified that she did not believe the letter submitted by Mr. Ziyad was written by the Decedent. She explained that her daughter Weatherley's name was misspelled in the letter as "Weatherly," and the Decedent would not have misspelled her name. Mrs. Tanner also explained that when the Decedent would type his own documents, he used all uppercase letters, and this supposed letter did not.

Mrs. Tanner testified that over a three to four year period, whenever the Decedent was checked into the hospital, she spent most every night at the hospital with him with the exception of two to three nights. Mrs. Tanner said she spent 90 to 95 percent of the time at the hospital with her husband, and she would only be away from the hospital for a few hours during the day to run errands. Mrs. Tanner said she only saw Mr. Ziyad at the hospital four to five times during the entire period, and she never saw the Decedent discuss business with Mr. Ziyad.

Mr. Daniel Glewwe testified that he had worked for the Decedent since 1998, and he became the Chief Financial Officer of the Tanner companies in 1999. Mr. Glewwe was not aware of any contractual relationship between Mr. Ziyad and the Decedent or his companies. He also said he did not know of any duties Mr. Ziyad performed for the Decedent or his companies. Mr. Glewwe testified that he met Mr. Ziyad at the Decedent's office, and he saw Mr. Ziyad there on several occasions, "generally annually" when Mr. Ziyad was soliciting donations for the Miss Black Memphis Pageant. Mr. Glewwe reviewed the records of the businesses' various accounts from 1996 to 2005, and he found five checks, from 1996, 1997, 1998, and 2005, made payable to the Miss Black Memphis Pageant. A $150 check from 2003 was made payable to Mr. Ziyad, personally, with the notation, "Gift - Son's Funeral." In 2005, Mr. Ziyad received a $600 check as payment for "herbs & spices, etc." and a $20 check as reimbursement for travel expenses. Another check was

made payable to Mr. Ziyad with a memo stating that it was to be cashed and given to the Decedent. Finally, a $600 check from October of 2005 bore the notation, "Loan until Pageant Over."

Mr. Steve Slyter, who is a certified forensic document examiner, testified as to his observations about the letter allegedly given to Mr. Ziyad by the Decedent. Mr. Slyter first noted his concern that there was no original copy of the letter, actually signed by the Decedent, available for review. He said it was very simple to create a "copy" of a document that never actually existed by inserting a copy of a genuine signature. Next, Mr. Slyter testified that the signature on the letter, which was dated August 20, 2005, was not consistent with the signature habits of the Decedent in 2005 according to other 2005 signature exemplars. Mr. Slyter explained that the Decedent demonstrated less writing skill in his 2005 exemplars when compared to earlier signatures. Mr. Slyter noted that in 2005, the Decedent was not using the same fluid writing movement, which resulted in more angled, flat signatures. In short, Mr. Slyter stated his opinion that the signature appearing on the photocopied letter was in fact the Decedent's signature, but it was not like his other 2005 signature exemplars. Mr. Slyter also said that he could not determine whether an original copy of the letter ever actually existed from examining the document.

At the conclusion of the trial, Mr. Ziyad's attorney requested the opportunity to submit a post-hearing brief, and the trial judge agreed to allow it. In Mr. Ziyad's post-hearing brief, he argued, for the first time, (a) that the August 2005 letter from the Decedent constituted constructive delivery of a gift of one million dollars to Mr. Ziyad, and (b), that the Decedent's conduct and letter established a trust or a resulting trust in favor of Mr. Ziyad. The post-hearing brief also addressed Mr. Ziyad's original argument that the parties had entered into a contract whereby the Decedent would pay Mr. Ziyad one million dollars for his personal services.

On June 29, 2007, the trial judge entered an order denying and dismissing Mr. Ziyad's claim against the Decedent's estate on the following grounds:

(a) The August 20, 2005 letter signed by the late William B. Tanner is not a contract because of (i) vagueness, (ii) the services rendered by the Claimant Muhammad Ziyad were not bargained for and exchanged for; (iii) there was no mutuality of consideration; (iv) there was no meeting of the minds and (v) the August 20, 2005 letter was not definite enough to be enforced as a contract;

(b) There was no gift by the late William B. Tanner of $1,000,000 to Muhammad Ziyad since there was no delivery of $1,000,000 and the August 20, 2005 letter does not represent a declaration of a gift with the present intent to transfer any funds;

(c) There is no declaration of a trust of $1,000,000; and

(d) There was no resulting trust of $1,000,000.

Mr. Ziyad timely filed a notice of appeal.

## II. Issues Presented

The appellant presents the following issue for review:

Did the Probate Court of Shelby County err in holding that Appellant had not presented a valid claim against the Estate of William B. Tanner by way of an enforceable contract, a gift or as a beneficiary of a trust created in Claimant's favor by the Decedent, William B. Tanner.

For the following reasons, we affirm the decision of the probate court.

## III. Standard of Review

On appeal, a trial court's factual findings are presumed to be correct, and we will not overturn those factual findings unless the evidence preponderates against them. Tenn. R. App. P. 13(d) (2008); *Bogan v. Bogan*, 60 S.W.3d 721, 727 (Tenn. 2001). For the evidence to preponderate against a trial court's finding of fact, it must support another finding of fact with greater convincing effect. *Watson v. Watson*, 196 S.W.3d 695, 701 (Tenn. Ct. App. 2005) (citing *Walker v. Sidney Gilreath & Assocs.*, 40 S.W.3d 66, 71 (Tenn. Ct. App. 2000); *The Realty Shop, Inc. v. R.R. Westminster Holding, Inc.*, 7 S.W.3d 581, 596 (Tenn. Ct. App. 1999)). When the resolution of the issues in a case depends upon the truthfulness of witnesses, the fact-finder, who has the opportunity to observe the witnesses in their manner and demeanor while testifying, is in a far better position than this Court to decide those issues. *Mach. Sales Co., Inc. v. Diamondcut Forestry Prods., LLC*, 102 S.W.3d 638, 643 (Tenn. Ct. App. 2002); *see also Bryant v. Baptist Health Sys. Home Care of E. Tenn.*, 213 S.W.3d 743, 750 (Tenn. 2006). The weight, faith, and credit to be given to a witness's testimony lies, in the first instance, with the trier of fact, and the credibility accorded by the trial judge will be given great weight by the appellate court. *Id.* We review a trial court's conclusions of law under a *de novo* standard upon the record with no presumption of correctness. *Union Carbide Corp. v. Huddleston*, 854 S.W.2d 87, 91 (Tenn. 1993) (citing *Estate of Adkins v. White Consol. Indus., Inc.*, 788 S.W.2d 815, 817 (Tenn. Ct. App. 1989)).

## IV. Discussion

### A. Contract

On appeal, Mr. Ziyad argues that an express oral contract existed between him and the Decedent, which was confirmed by the letter from the Decedent in 2005. Mr. Ziyad also argues that the contract can be implied from the parties' conduct.

It is well established in Tennessee that a contract can be expressed, implied, written, or oral,[3] but a valid and enforceable contract must, among other things, result from a meeting of the minds and must be sufficiently definite to be enforced. ***Admin. Resources, Inc. v. Barrow Group, LLC***, 210 S.W.3d 545, 557 (Tenn. Ct. App. 2006); ***Rice v. NN, Inc. Ball & Roller Div.***, 210 S.W.3d 536, 542 (Tenn. Ct. App. 2006); ***Thompson v. Hensley***, 136 S.W.3d 925, 929 (Tenn. Ct. App. 2003); ***Peoples Bank of Elk Valley v. ConAgra Poultry Co.***, 832 S.W.2d 550, 553 (Tenn. Ct. App. 1991). "A contract must be of sufficient explicitness so that a court can perceive what are the respective obligations of the parties." ***Doe v. HCA Health Servs. of Tenn., Inc.***, 46 S.W.3d 191, 196 (Tenn. 2001) (citation omitted). The terms of the contract are reasonably certain if they provide a basis for determining the existence of a breach of the contract and for giving an appropriate remedy. ***Id.*** (quoting *Restatement (Second) of Contracts*, § 33(2) (1981)). Indefiniteness regarding an essential element of the contract may prevent the creation of an enforceable contract. ***Id.*** "If the essential terms of an alleged agreement are so uncertain that there is no basis for deciding whether the agreement has been kept or broken, there is no contract." ***Peoples Bank of Elk Valley***, 832 S.W.2d at 553-54 (citing *Restatement (Second) of Contracts*, § 33 (1981)). An alleged contract may be so lacking in definiteness that it indicates that the mutual assent required to make or modify a contract is lacking. ***Id.*** (quoting *Jamestowne on Signal, Inc. v. First Fed. Sav. & Loan Ass'n*, 807 S.W.2d 559, 564 (Tenn. Ct. App. 1990)).

A mere expression of intent or a general willingness to do something does not amount to an "offer." ***Rice***, 210 S.W.3d at 542. "Even though a manifestation of intention is intended to be understood as an offer, it cannot be accepted so as to form a contract unless the terms of the contract are reasonably certain." ***Id.***

In the present case, even if we accept the testimony of Mr. Ziyad as true, the facts presented are insufficient as a matter of law to show an agreement creating a binding, enforceable contract. According to Mr. Ziyad, the "agreement" was based on the Decedent telling him, in 1985, "if you keep on being available and doing the things that I need you to do, then one day I'm going to give you a million dollars." As we said in ***Peoples Bank of Elk Valley***, "It is difficult for this Court to imagine how the contract alleged . . . could be enforced." 832 S.W.2d at 554. We do not know whether Mr. Ziyad met his obligations under the "agreement" by praying with the Decedent and running errands for him from time to time. "A contract must be of sufficient explicitness so that a court can perceive what are the respective obligations of the parties." ***Doe***, 46 S.W.3d at 196. Here,

---

[3] "An express oral contract and a contract implied in fact are very similar with the primary difference between them being the manner in which the parties manifest their assent." ***Thompson v. Hensley***, 136 S.W.3d 925, 930 (Tenn. Ct. App. 2003). In an express contract, the parties assent to the terms by means of words, writings, or another mode of expression. ***Id.*** In a contract implied in fact, the conduct of the parties and the surrounding circumstances show mutual assent to the terms of the contract; it is not necessarily expressed in words. ***V.L. Nicholson Co. v. Transcon Inv. & Fin. Ltd., Inc.***, 595 S.W.2d 474, 482 (Tenn. 1980); ***Thompson***, 136 S.W.3d at 930. "Contracts implied in fact arise under circumstances which, according to the ordinary course of dealing and common understanding of men, show a mutual intention to contract." ***Cobble v. McCamey***, 790 S.W.2d 279, 281 (Tenn. Ct. App. 1989). We look to the conduct of the parties in light of all the circumstances to determine whether an implied contract exists. ***Scandlyn v. McDill Columbus Corp.***, 895 S.W.2d 342, 345-46 (Tenn. Ct. App. 1994).

there was no proof regarding essential terms of the agreement, and there is no basis for determining whether the agreement was kept or broken.  There was, therefore, no contract.

Mr. Ziyad claims that "the issue the court must decide is whether the claimant expected payment for the services at the time the services were rendered," citing the case of *In re Estate of Haynes*, No. M2002-01896-COA-R3-CV, 2003 WL 22056011 (Tenn. Ct. App. W.S. Sept. 4, 2003) *perm. app. denied* (Tenn. Mar. 1, 2004).  In *Haynes*, the plaintiffs sought to recover compensation for personal services they provided to the decedent for eight years prior to her death.  *Id.* at *1. Specifically, they had performed general maintenance work and gardening for the Decedent, and they provided her with daily meals and transportation.  *Id.*  The plaintiffs submitted a document signed by the decedent which stated, "After I am gone I want you [and] Elaine to be paid $150,000 dollars for all the things you have done for me over the years and haven't been paid for."  *Id.*  The note did not meet the requirements for a testamentary disposition.  *Id.* at *5.  The probate court granted the plaintiffs' claim for compensation, but on appeal, this Court reversed, finding there was no implied contract.  *Id.*  The issue was whether the plaintiffs expected payment for their services at the time they were rendered.  *Id.* at *4.  We explained,

> Where one renders services to another in the hope or expectation of a legacy, devise, or other provision by will for his benefit, without any contract, express or implied, but relying solely upon the generosity of the person for whom such services were rendered, he cannot recover for such services because of the failure of such person to make such testamentary provision in his behalf.

*Id.* at *3 (quoting *Cobble v. McCamey*, 790 S.W.2d 279, 282 (Tenn. Ct. App. 1989)).  The testimony indicated that the plaintiffs expected payment from the estate after the decedent died.  *Id.* at *5. Without a valid contract for payment, they could not recover because of the failure of the testamentary provision.  *Id.*

In another similar case, *In re Estate of Measles*, No. M2004-00244-COA-R3-CV, 2005 WL 1521872 (Tenn. Ct. App. W.S. June 27, 2005), the decedent's stepson and the stepson's wife had provided assistance to the decedent for six years prior to her death, and the decedent lived with them for several months out of the year.  Various friends of the decedent testified that she wanted her stepson to be paid back for everything he did for her.  *Id.* at *4.  The trial court granted the stepson's claim against the estate on an implied contract theory, but on appeal this Court reversed.  *Id.* at *5. We stated that the stepson had the burden of proving that he and his wife performed the services for the Decedent "with the expectation that they were to be paid in some manner at the time the services were rendered, *during the Decedent's life.*"  *Id.* at *7 (emphasis added).  The plaintiffs failed to meet that burden:

> Rather than establishing the existence of a contract for payment at the time the services were rendered, this testimony establishes the Decedent's intention to include the claimants in her Last Will and Testament so that they would recover payment from her estate, to the extent that the estate would be able to pay, for the expenses

related to her care. . . . Thus, based on the record before us, we must conclude that the evidence preponderates against the trial court's finding that the parties entered into an implied or quasi contract, and preponderates in favor of a finding that the Decedent intended, but failed, to include the claimants in her Will. "[W]ithout any other contract for payment, there can be no recovery because of the failure of such testamentary provision." [*Hughes*, 2003 WL 22056011,] at *5.

*Id.* at *8.

In the case at bar, we similarly conclude that Mr. Ziyad did not perform services for the Decedent with the expectation that he would be paid at the time the services were rendered during the Decedent's life. Mr. Ziyad repeatedly testified that he expected to be "rewarded" for his services, and when asked whether he expected to be compensated during the Decedent's lifetime, Mr. Ziyad said, "if he lived or if he died." Mr. Ziyad testified that he never asked the Decedent to pay him anything during his lifetime, even when the Decedent fell very ill, explaining, "I knew that [the Decedent] had promised me the million dollars[.]"

Considering all the circumstances, we also conclude that the Decedent did not intend to create a binding contract that would be enforceable against him. For example, if the Decedent owed Mr. Ziyad one million dollars, why did he *loan* Mr. Ziyad $600 just before he died in 2005? In the August 2005 letter, the Decedent did not recognize any mandatory obligation to pay Mr. Ziyad, and he explicitly stated that he might not pay Mr. Ziyad anything during his lifetime, stating:

> You have always been there for me as a friend whenever i have needed you. And you have never ask me [sic] for anything. God only knows whether I will make it through these trying times, if I do I want to ask him to help me to help you with your life and your business involvements. I am going to give you a million dollars if I live. And in if [sic] God wills that I go the the [sic] next world with Jesus Christ I want you to have a million dollars in cash and value from my estate.

We find no enforceable contract, express or implied, to support Mr. Ziyad's claim against the Decedent's estate for one million dollars.

### B. Gift

Next, Mr. Ziyad claims that the Decedent's letter constituted constructive delivery of a gift to him of one million dollars.

The burden of proving that a gift was made, including the existence of all the elements necessary to its validity, is upon the donee or the party asserting the gift. **Hansel v. Hansel**, 939 S.W.2d 110, 112 (Tenn. Ct. App. 1996) (quoting 38 Am. Jur. 2d *Gifts* § 92). "Intent and delivery must be clearly proved, and 'doubts must be resolved against the gift.'" **Weston v. Cmty. Baptist**

***Church of Wilson County***, No. M2004-02688-COA-R3-CV, 2007 WL 394644, at \*7, n.9 (Tenn. Ct. App. Feb. 5, 2007) (quoting *Figuers v. Sherrell*, 178 S.W.2d 629, 632 (Tenn. 1944)).

"The formal requirements of a gift are the intention by the donor to make a present gift coupled with the delivery of the subject of the gift by which complete dominion and control of the property is surrendered by the donor." **Hansel**, 939 S.W.2d at 112 (citing *Lowry v. Lowry*, 541 S.W.2d 128 (Tenn. 1976); *Arnoult v. Griffin*, 490 S.W.2d 701 (Tenn. Ct. App. 1972)). "Evidence of intent, alone, is not sufficient to establish a gift." **Id.** Delivery is necessary to perfect the gift. **Id.** (citing *Wilson v. Wilson*, 267 S.W. 364 (1924)). There is no delivery unless complete dominion and control of the gift is surrendered by the donor and acquired by the donee. **Id.**

Here, the letter from the Decedent did not meet the requirements necessary to make a gift of one million dollars, as the Decedent did not make a *present* gift or deliver the gift. The letter stated, "I am *going to give* you a million dollars *if* I live." (emphasis added). This mere statement regarding the Decedent's future intent does not constitute a valid gift. In addition, it is undisputed that the letter does not satisfy the legal requirements for a testamentary provision.

### C. Trust

Finally, Mr. Ziyad claims that the letter and the parties' conduct established "a trust of which he is the beneficiary."

"A donating party will be deemed to have created a trust only if the party has expressed with certainty its intent to create a trust." **Tenn. Div. of United Daughters of the Confederacy v. Vanderbilt Univ.**, 174 S.W.3d 98, 113 (Tenn. Ct. App. 2005); *see also* Tenn. Code Ann. § 35-15-402 (2007) ("A trust is created only if: . . . (2) The settlor indicates an intention to create the trust[.]"). "Moreover, the expression of trust intent must be definite and particular, *i.e.*, the donating party must express a particular intent to confer benefits through the medium of a trust rather than through some related or similar device." **Id.** (citing *Ratto v. Nashville Trust Co.*, 159 S.W.2d 88, 90 (1942); *Bogert on Trusts* § 46, at 489-91; 15 Am. Jur. 2d *Charities* § 8, at 19). A mere expression of a donative intent does not constitute an expression of trust intent. **Id.** (citing *Bogert on Trusts* § 46, at 492, 494).

In this case, there is no indication that the Decedent declared his intention to create a trust for the benefit of Mr. Ziyad. The Decedent certainly knew how to create a trust, as he created numerous trusts for the benefit of his daughters.

Mr. Ziyad also cites **Estate of Queener v. Helton**, 119 S.W.3d 682, 686-87 (Tenn. Ct. App. 2003), where the Court thoroughly discusses resulting trusts:

> As to the Trial Court's finding a resulting trust . . . [o]ur Supreme Court has explained a resulting trust as follows:

The imposition of a resulting trust is an equitable remedy; the doctrine of resulting trust is invoked to prevent unjust enrichment. Such a trust is implied by law from the acts and conduct of the parties and the facts and circumstances which at the time exist and surround the transaction out of which it arises. Broadly speaking, a resulting trust arises from the nature or circumstances of consideration involved in a transaction whereby one person becomes invested with a legal title but is obligated in equity to hold his legal title for the benefit of another, the intention of the former to hold in trust for the latter being implied or presumed as a matter of law, although no intention to create or hold in trust has been manifested, expressly or by inference, and there ordinarily being no fraud or constructive fraud involved.

While resulting trusts generally arise (1) on a failure of an express trust or the purpose of such a trust, or (2) on a conveyance to one person on a consideration from another – sometimes referred to as a "purchase-money resulting trust"– they may also be imposed in other circumstances, such that a court of equity, shaping its judgment in the most efficient form, will decree a resulting trust – on an inquiry into the consideration of a transaction – in order to prevent a failure of justice.

*In re Estate of Nichols*, 856 S.W.2d 397, 401 (Tenn.1993). The Supreme Court went on to state, "While an implied or resulting trust may be established by parol evidence, yet both upon reason and authority the courts will not enforce it, unless it be established by the most convincing and irrefragable evidence. In other words, it must be sustained by proof of the clearest and most convincing character." *Id.* at 402.

Resulting trusts are typically found where there is evidence that someone is "holding" property that is in his or her name for the benefit of another, or where the beneficiary of the trust has paid money toward and/or worked toward property that is in someone else's name with the agreement that the property would become the beneficiary's property. See *Wardell v. Dailey*, 674 S.W.2d 293 (Tenn. Ct. App. 1983); *Saddler v. Saddler*, 59 S.W.3d 96 (Tenn. Ct. App. 2000). As our Court has explained:

A resulting trust arises from the nature of circumstances of consideration involved in a transaction whereby one person thereby becomes invested with a legal title but is obligated in equity to hold his legal title for the benefit of another, the intention of the former to hold in trust for the latter being implied or presumed as a matter of law, although no intention to create or hold in trust has been

-12-

> manifested, expressly or by inference, and although there is an absence of fraud or constructive fraud.
>
> *Rowlett v. Guthrie*, 867 S.W.2d 732, 735 (Tenn. Ct. App. 1993).

**Estate of Queener**, 119 S.W.3d at 686-87.  Keeping these principles in mind, we conclude this is not an appropriate case for imposing the equitable remedy of a resulting trust.

## V.  CONCLUSION

For the aforementioned reasons, we affirm the decision of the probate court.  Costs of this appeal are taxed to the appellant, Muhammad Ziyad, and his surety, for which execution may issue if necessary.

_____
ALAN E. HIGHERS, P.J., W.S.