FILED
05/27/2020
Clerk of the
Appellate Courts

IN THE COURT OF APPEALS OF TENNESSEE
AT NASHVILLE
Assigned on Briefs March 4, 2020

## JACOB DALTON DICUS, ET AL. v. LISA GAYE SMITH

**Appeal from the Chancery Court for Williamson County**
**No. 45683     James G. Martin, III, Judge**

_____

### No. M2019-01495-COA-R3-CV
_____

This is a partition suit.  The residential property at issue was purchased approximately three months before Plaintiff's father died from a terminal condition.  The deed to the property listed the owners as Plaintiff's father and his former girlfriend, and the two of them resided together at the property for the last three months of his life.  After Plaintiff's father died, Plaintiff, his sole heir, brought this partition suit individually and as executor of his father's estate.  Plaintiff asserted that his father's former girlfriend should not receive any of the proceeds from the sale of the home because she did not financially contribute to its purchase.  The former girlfriend took the position that Plaintiff's father gifted her a one-half interest in the home because she agreed to act as his live-in caregiver in the last three months of his life.  The trial court found clear and convincing evidence to establish the elements of a gift and split the proceeds of the sale of the home equally, after accounting for some expenses paid by Plaintiff.  Plaintiff appeals, arguing that the proof did not establish a gift.  We affirm and remand for further proceedings.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Chancery Court Affirmed and Remanded**

CARMA DENNIS MCGEE, J., delivered the opinion of the court, in which D. MICHAEL SWINEY, C.J., and FRANK G. CLEMENT, JR., P.J., M.S., joined.

Johnny D. Hill, Jr., Fayetteville, Tennessee, for the appellants, Jacob Dalton Dicus, and Estate of James Randall Dicus.

Jake Hubbell, Columbia, Tennessee, for the appellee, Lisa Gaye Smith.

## MEMORANDUM OPINION[1]

### I. FACTS & PROCEDURAL HISTORY

James Randall ("Randy") Dicus was married and divorced twice. He had only one child, Jacob Dalton Dicus. Randy and Jacob always maintained a close relationship, even though Randy lived in Kentucky while married to his second wife.[2] Jacob lived in Donelson, Tennessee, with his wife and children. Randy traveled back to Tennessee frequently to visit Jacob in Donelson and to visit Randy's father at the family farm in Waynesboro, Tennessee.

Somewhere around 2013, Randy's second marriage ended, and he returned to Tennessee. For some time, he alternated between staying with Jacob and his family in Donelson and staying at his father's family farm in Waynesboro. Around 2014, Randy, who was in his fifties, was diagnosed with cirrhosis of the liver. His younger brother was battling the same condition and died about a year later. Randy's father also passed away during this time period, and Randy inherited the 300-acre family farm in Waynesboro. Jacob offered to let Randy move in with him and his family, but Randy said he did not want his son to watch him die the same way he had watched his brother die.

In late May 2016, Randy and his high school girlfriend, Lisa Gaye Smith, purchased a house for $274,000 in Thompson's Station, Tennessee. The deed states that the property was conveyed to "James Randall Dicus, unmarried and Lisa Gaye Smith[,] unmarried." Although he still maintained the family farm in Waynesboro, Randy and Lisa resided in the Thompson's Station home together from mid-June 2016 until Randy's death three months later, on September 20, 2016. Randy had executed a last will and testament in July 2016, leaving all of his estate to his "beloved son," Jacob. However, the will did not specifically mention the Thompson's Station property purchased just a month earlier.

Randy's will named Jacob as the executor of his estate and directed Jacob to pay all of Randy's just debts and funeral expenses. The chancery court of Williamson County issued letters testamentary designating Jacob as executor of his father's estate. Upon investigation, Jacob learned that the Thompson's Station property was jointly titled

---

[1] Rule 10 of the Rules of the Court of Appeals of Tennessee provides:

> This Court, with the concurrence of all judges participating in the case, may affirm, reverse or modify the actions of the trial court by memorandum opinion when a formal opinion would have no precedential value. When a case is decided by memorandum opinion it shall be designated "MEMORANDUM OPINION", shall not be published, and shall not be cited or relied on for any reason in any unrelated case.

[2] Because a number of individuals share the last name Dicus, we will refer to the parties by their first names. We intend no disrespect.

in the names of Randy and Lisa.  He also discovered that Randy paid $5,000 in earnest money in addition to closing costs and obtained a personal loan for the remainder with a one-year promissory note for $274,000.  Instead of securing a traditional mortgage, Randy had pledged funds in a savings account (that contained about $425,000) as collateral for the personal loan.  As such, he would owe a single payment of $280,439.00 (with finance charges) after one year, with that payment due on May 16, 2017.  As executor, Jacob paid off the note in April 2017 with $275,096 in estate funds.

After Randy's death, Lisa continued to live in the Thompson's Station home with her three children and one grandchild.  On October 24, 2016, Jacob filed this suit individually and as executor of Randy's estate seeking partition of the property.  The complaint alleged that Randy and Lisa owned the Thompson's Station property as tenants in common, with no right of survivorship, and that Randy's interest vested in Jacob as the sole heir of his father's estate.  Jacob sought a partition by sale.  He alleged that Lisa made no monetary contribution toward the purchase and asked the court to adjudicate the "rights and equities of the parties with respect to the residence."  Specifically, he asked the court to compensate him from the partition sale proceeds for the amounts Randy had expended for the purchase of the property.[3]

Lisa filed an answer admitting that she made no monetary contribution toward the purchase of the property.  She initially took the position that Randy wanted her to own the home outright as "compensation" for caring for him during his final days, but by the time of trial, she took the position that Randy gifted her a one-half interest in the home because she acted as his caregiver.  The parties agreed for the property to be sold but disagreed as to how to divide the proceeds from the sale.  Lisa sought one-half of the proceeds (after expenses were paid), while Jacob asserted that Lisa was not entitled to any of the proceeds because she did not contribute any money toward the purchase of the home.

The trial court heard testimony from Lisa, her former co-worker, a sheriff's deputy, and Jacob.  The deposition testimony of a realtor was also submitted.  Lisa described her history with Randy and the circumstances leading up to the purchase of the home.  Lisa explained that she and Randy dated throughout their high school years and that she ended their four-year relationship during their senior year in 1978.  She said they were merely friends thereafter, with both of them marrying and divorcing twice.  In the early nineties, Randy contacted Lisa about caring for his mother as she battled cancer.  Lisa testified that she "had sat for people before," and Randy's father ultimately hired her to act as a caregiver for Randy's mother during the last months of her life.  Lisa assisted with house cleaning, feeding and bathing Randy's mother, and meeting basic medical needs during the daytime hours when Randy's father was at work.  Randy and Lisa had

---

[3] We note that Lisa has not raised any issue regarding Jacob's right to seek contribution in his individual capacity or as executor of the estate.

"off and on" contact in the years that followed.

Lisa had a daughter who passed away in 2015, which was after Randy's second divorce. Lisa testified that Randy reconnected with her around that time to express his condolences. He began calling her and visiting her at the restaurant and bar where she worked several times a week. Lisa testified that Randy wanted to help her out in any way that he could and insisted on giving her money. She testified that Randy wanted to pursue a relationship as well and repeatedly asked her to marry him, but she declined. At some point, Randy informed Lisa that his health was failing and that he believed he was going to die. He asked Lisa if she would care for him as she had cared for his mother. According to Lisa, Randy offered to buy her a house and pay her $5,000 per month if she would move in with him and take care of him. Lisa was living with a boyfriend at the time and did not agree to the proposition at first. However, she said that her boyfriend eventually convinced her that she would be crazy not to accept Randy's offer. She conceded that the agreement sounded "too good to be true" because someone was going to buy her a home if she would simply care for him and be there for him in his last days. She said she loved Randy as a friend and knew that he loved her, so she quit her job and agreed to the deal.

Lisa testified that Randy instructed her to find a realtor and start looking for a house with a budget of $250,000 to $300,000. She said they discussed buying a home in Williamson County because she had custody of her deceased daughter's child and wanted to keep her in that school district. They also wanted a location somewhere between Donelson (where Jacob lived) and Waynesboro (where the family farm was located). Lisa contacted a realtor she had used in the past and looked at a few homes with her. Lisa and the realtor viewed some homes without Randy, but he went with them to view others. According to Lisa, Randy told her that "he didn't care what the house was" and that he would be involved when it was time to sign the documents. Lisa and Randy made an offer on a home, but it was not accepted. Thereafter, they located the home in Thompson's Station. Lisa viewed the home the first time by herself, on May 15, 2016, and she signed an offer that was contingent on Randy's approval. He viewed the house with her the next day and approved it. They both attended the closing on May 27 and signed the documents together in the spaces designated for the buyers. Lisa testified that the realtor specifically discussed the fact that the property would be deeded to both of them. The deed, which was introduced as an exhibit at trial, reflects that it was recorded on June 3, 2016.

Lisa testified that she moved in within a week of closing and that Randy moved in around mid-June. She testified that he was already in bad health by this time but that he was mobile and able to drive. When they moved into the home, Randy did not need much assistance, and her role was mostly limited to taking him to doctor's appointments and preparing his food. He stopped driving around a month later but remained mobile as far as making his way around the house. Lisa testified that his decline near the end

- 4 -

happened very quickly and much faster than they expected. Toward the end of the three-month period that they lived together, hospice care was provided. Lisa assisted with his medications and maintaining his urine bag. Lisa testified that she was the only person present when Randy died during the early morning hours of September 20, 2016.

During cross-examination, Lisa provided conflicting testimony about numerous issues, including whether her driver's license was suspended and the circumstances surrounding various checks she cashed from Randy's accounts. Although she testified that Randy agreed to pay her $5000 per month, checks were introduced reflecting that she received much more than that from his accounts in the weeks before his death on September 20. She cashed two $6000 checks in August and checks for $2000, $4000, and $10,000 in early September. She initially insisted that Randy signed the checks but later admitted that she had told police during an investigation that she signed some of the checks herself. She also said that Randy "graciously paid" for her to spend a week at Disney World with her family members during the time that he was in hospice care. In addition, checks totaling $35,000 were written from Randy's account to Lisa's "long-time family friend" in late August and early September. She testified that she owed the individual a debt and that Randy wanted to help her get out of debt before he died. Lisa admitted that she had attempted to cash another check for $35,000 on the day before Randy died, but the bank teller refused to cash it. The trial judge remarked that Lisa's testimony as to these matters was "very inconsistent."

One of Lisa's co-workers from the restaurant and bar testified about his observations of Lisa and Randy. He testified that Randy came into the restaurant at least two to three times a week to see Lisa, and the other employees came to know him by name. He said Lisa worked at the to-go counter, so Randy exclusively ordered food to-go. The co-worker recalled Randy staying for ten to fifteen minutes when the restaurant was busy but periods of two to three hours if it was slow. He testified that he observed Randy's frequent visits over a period of about eighteen months. He also recalled seeing Randy give Lisa large amounts of cash at least twenty times during that period. He said Randy would hand Lisa "a big wad of cash" that greatly exceeded the amount of any restaurant bill, including twenties and one hundred dollar bills.[4]

The realtor testified by deposition. She said Lisa initiated their contact by calling and telling her that "she had somebody who was going to help her and would be purchasing the house for her and him was my understanding." The realtor testified that she and Lisa met to view the first few houses, and Randy joined them when they visited additional houses. The realtor confirmed that they were wanting a house in the Williamson County school district. The documents for the offer on the first house and for the purchase of the Thompson's Station house all listed both Randy and Lisa as the

---

[4] The co-worker testified that he left the restaurant in November 2015. Thus, his timeline seems to contradict Lisa's testimony that she and Randy reconnected after her daughter died in December 2015.

buyers. The realtor testified that she filled in the paperwork in this manner because she was sitting there with both of them at the time, and they had both signed the agency agreement retaining her. The realtor was of the understanding that Randy was purchasing the home for them to live in together "as a couple." The realtor also assumed that they would both be listed on the deed "as a couple." She had observed Randy putting his arm around Lisa and believed that they were romantically involved. She remembered Randy saying that he liked the Thompson's Station house and that "as long as Lisa was happy with it" then he would buy it. The realtor testified that Randy understood that the property was being deeded to both of them.

The realtor testified that Randy called her about three to six weeks after the closing with a question about how the property was deeded because he had not received a copy of the deed yet. Although she could not recall the details at her deposition three years later, she believed he mentioned something about that his family member "wasn't sure that it should be deeded to two people." The realtor could not answer his question and advised him to contact the title company. She also recalled a conversation with Lisa in which she asked about getting a copy of the deed. The realtor testified that she and the parties never discussed adding "survivorship" language to the deed because that was not something that she considered until after Randy passed away.

Jacob also testified at trial. He did not know Lisa very well before she and Randy moved in together. He was aware that they were high school sweethearts and that Lisa cared for his grandmother before she passed away. Jacob thought that Randy and Lisa had engaged in "a relationship" prior to his death. He testified that Randy also "thought it was to be a relationship." Jacob testified that shortly after Randy and Lisa moved in together, Randy realized "that was not going to be the case" and Randy "was not pleased with how it went about."

Jacob testified that before Randy died, Randy had been involved with litigation involving his brother's estate and his brother's girlfriend. Thus, he agreed that one "would have thought" that Randy would appreciate the importance of having his affairs in order. He added, "To me, the way he put it to me, he thought that the way he did it with this loan was going to satisfy the way he wanted it to go." However, Jacob believed that the terms of the transaction were "strange."

Jacob recognized his father's signature and verified that Randy signed all of the closing documents listing himself and Lisa as the buyers of the Thompson's Station home. He testified that his father paid the $5,000 down payment and obtained the personal loan for the purchase of the home, and Jacob made the single payment of around $275,000 to pay off the loan secured by the savings account after Randy died. Jacob testified that Lisa did not contribute any payments toward the purchase of the home. He asked the court to "adjust the equities" based on the amounts paid by Randy compared to her lack of contribution. Jacob had also paid for the property taxes on the home, and

there was an outstanding judgment and lien obtained by a homeowner's association.

Jacob testified that numerous checks introduced at trial were signed by someone other than his father. A sheriff's deputy also testified regarding the suspicious checks. He testified that the bank had contacted the sheriff's department about the checks. The sheriff's deputy investigated the matter, and Lisa came to his office and admitted that she had signed some of the checks herself, contrary to her testimony during this trial about the same checks. However, the deputy testified that the district attorney determined they did not have enough proof to proceed with criminal charges.

The trial court took the matter under advisement and issued a twenty-page written order on August 1, 2019. The trial court found that Lisa's testimony "was inconsistent throughout trial." It listed numerous examples of how her testimony was not credible. The trial court concluded by stating that "[Lisa] is not a credible witness" and that the court "discredits all of her testimony."

Despite these findings regarding Lisa's credibility, the court framed the determinative issue as whether Randy intended to gift Lisa a one-half interest in the house when it was purchased. In its lengthy factual findings, the trial court found that Randy told Lisa that he would buy her a house and give her $5,000 a month if she would quit her job and care for him. The court noted that Randy had the option of residing with Jacob but declined because he did not want Jacob to watch him die. The trial court found that Randy gave Lisa a budget of $250,000 to $300,000 and the responsibility for identifying a suitable house. It found that they agreed to purchase a house in the Williamson County school district because of Lisa's granddaughter. The court found that Lisa made an offer on the Thompson's Station home subject to Randy's approval, and Randy visited and approved the house the following day. The trial court found that the realtor thoroughly reviewed the purchase and sale agreement with Randy and Lisa, and both signed the closing documents. The trial court found that the realtor discussed putting both names on the deed with Randy and Lisa and that both were aware that the deed conveyed the house to them jointly. The trial court concluded that the parties acquired the property in equal shares as tenants in common.

The trial court thoroughly analyzed four similar cases cited by the parties. Applying the principles derived from those cases, it found clear and convincing evidence to establish that "[Randy] intended to gift [Lisa] a one-half interest in the house." The trial court explained that it reached this conclusion, even though it did not find Lisa credible, because there was other evidence regarding Randy's intent at the time the house was purchased. For instance, the trial court considered the fact that Randy pledged his savings account to secure the personal loan rather than obtaining traditional financing. The trial court noted that Randy could have used a traditional mortgage or simply paid the balance in cash. It found that he had the financial means to purchase the house without Lisa's involvement if he had desired to do so. Instead, the court noted, they both

signed the purchasing documents, and the house was jointly titled.  The trial court also pointed out that Randy executed a will one month later and directed his executor to pay his debts and expenses.  One of his debts was the balance owed on the promissory note secured by the savings account.  Thus, the trial court concluded that Randy intended for his son to pay the debt and to own the house equally with Lisa at his death.

Having found that Randy intended to gift Lisa a one-half interest in the house, the trial court found that Lisa and Jacob "now own the house in equal shares."  They had already agreed to sell the house, so the trial court ruled that the net proceeds from the sale would be divided equally after crediting Jacob for one-half of the expenses paid since Randy's death.  Jacob timely filed a notice of appeal.

## II.  ISSUES PRESENTED

Jacob presents the following issues for review on appeal:

1.      Whether the trial court erred by finding that Randy made a gift of a one-half interest in the property to Lisa.
2.      Whether the trial court erred by not adjusting the amounts awarded to each party because of the excess contributions by Jacob and his father.

For the following reasons, we affirm the decision of the chancery court and remand for further proceedings.

## III.  STANDARD OF REVIEW

"When reviewing a trial court's findings following a bench trial, this Court reviews the record *de novo* and presumes that the trial court's findings of fact are correct unless the preponderance of the evidence is otherwise."  *M & M Elec. Contractor, Inc. v. Cumberland Elec. Membership Corp.*, 529 S.W.3d 413, 422 (Tenn. Ct. App. 2016) (citing *Nashville Ford Tractor, Inc. v. Great Am. Ins. Co.*, 194 S.W.3d 415, 424 (Tenn. Ct. App. 2005)).  Appellate courts review a trial court's legal conclusions *de novo* without a presumption of correctness.  *Id.*

## IV.  DISCUSSION

The parties and the trial court heavily relied on four similar cases involving unmarried individuals and jointly owned property to guide their analysis of the issues in this case.  Thus, we will review the trial court's interpretation and application of those four cases and attempt to reconcile their holdings.

"The principles governing the division of jointly-owned property in cases such as this one are derived from the statutes and legal precedents involving the partition of

jointly-owned property." *Rivkin v. Postal*, No. M1999-01947-COA-R3-CV, 2001 WL 1077952, at *10 (Tenn. Ct. App. Sept. 14, 2001). In *Rivkin*, the parties were cohabiting as a couple but unmarried. *Id.* at *1. The man purchased a home for them for $420,000 as sole owner and then quitclaimed it to himself and the woman as tenants in common with a right of survivorship one month later. *Id.* at *10. When they separated and sought partition of their jointly owned property, the trial court awarded the parties equal shares of the proceeds from the sale of the home. *Id.* On appeal, the man argued that the woman should not receive any of the proceeds because she failed to prove that he intended to give her an interest in the property. *Id.* This Court explained that a partition "need not be equal" but "should be consistent with the respective co-owners' interests as shown by the evidence." *Id.* We also recognized that "[a] party seeking to establish an interest in property by gift must prove (1) that the donor intended to make a gift to the donee and (2) that the donor delivered or transferred the property to the donee." *Id.* at *11 (citing *Dunlap v. Dunlap*, 996 S.W.2d 803, 814-15 (Tenn. Ct. App. 1998); *Arnoult v. Griffin*, 490 S.W.2d 701, 710 (Tenn. Ct. App. 1972)). We concluded that the woman proved both elements in *Rivkin*. The language of the quitclaim deed itself provided evidence of the man's present intent to convey ownership, and the evidence that he caused the quitclaim deed to be recorded provided evidence of delivery. *Id.* Because the proof showed that the man gave the woman an undivided one-half interest in the property via the quitclaim deed, we concluded that the trial court did not err in awarding each party an equal share of the proceeds from the sale of the property. *Id.*

In the case at bar, the trial court discussed *Rivkin* in detail and stated, "Like in *Rivkin*, this Court must determine whether [Lisa] established, by clear and convincing evidence, that [Randy] intended to make her an *inter vivos* gift when purchasing the subject property." We discern no error in the trial court's analysis to this point.

Next, the trial court analyzed *Harris v. Taylor*, No. W2004-02855-COA-R3-CV, 2006 WL 772007, at *1 (Tenn. Ct. App. Mar. 28, 2006), another partition suit involving unmarried parties who jointly purchased a residence. The woman paid the entire down payment on the property, totaling $54,000, and the parties financed the remainder of $160,800. *Id.* Relying on *Rivkin* and the language of the deed, the trial court evenly split the proceeds of the sale of the property even though one joint tenant had paid more than her equitable share of the purchase money and the mortgage payments. *Id.* The woman argued that she was entitled to contribution from the man for the excess paid by her and that she did not make a gift of the excess to him. *Id.* This Court agreed. We began with the proposition from *Rivkin* that a partition of property "should be consistent with the respective co-owners' interests as shown by the evidence." *Id.* at *3. However, we also explained that "[w]hile the interests of joint tenants are presumed to be equal, 'in the case of a *joint purchase* of land, if one pa[ys] more than his half of the purchase money, a Court of Equity [will] hold the land bound for the excess.'" *Id.* (quoting *Rankin v. Black*, 38 Tenn. (1 Head) 650, 658 (Tenn. 1858)) (emphasis added). In the case of joint purchasers, "'the party paying the excess has the right to be reimbursed out of the land.'"

*Id.* (quoting 7 Tenn. Jur. *Contribution & Exoneration* § 11 (2005)). We found *Rivkin* distinguishable because it had involved property purchased in the name of one party that was then conveyed by quitclaim deed to both parties, while *Harris* involved joint purchasers of property from a third party. *Id.* at *4. We explained:

> While *Rivkin* supports the proposition that a gift *inter vivos* has been made when an owner of real property conveys an interest to another in that real property by deed and then records the deed without any consideration for doing so, we find that rationale does not apply where a third party conveys property jointly to multiple parties who are purchasing the property, one of which has paid more than his or her equitable share of the purchase money.

*Id.*

Still, the *Harris* Court went on to consider whether the elements of a gift had been shown by the evidence in the record. The Court reiterated that two elements must be present in order to find a properly executed gift *inter vivos*: (1) the donor must have the present intent to make a gift to the donee, and (2) the donor must deliver the gift to the donee, surrendering complete dominion and control of it. *Id.* (citing *In re Estate of Greene*, No. W2004-02910-COA-R3-CV, 2005 WL 2978991, at *7-8 (Tenn. Ct. App. Nov. 7, 2005)). The donor's intent must be determined from the totality of the circumstances. *Id.* The testimony of the beneficiary of the gift, standing alone, is not sufficient to establish the gift. *Id.* "'To prove delivery, the donee must show evidence free from personal interest and not equivocal in character that the property claimed was delivered to donee during the donor's life.'" *Id.* (quoting *In re Estate of Greene*, 2005 WL 2978991, at *7-8). The beneficiary's "[m]ere possession of the property" is not enough. *Id.* "'The donee must prove both intent and delivery by clear and convincing evidence.'" *Id.* (quoting *In re Estate of Greene*, 2005 WL 2978991, at *7-8).

In *Harris*, "the only evidence presented at trial other than the deed" was the competing testimony from the parties regarding whether a gift of the down payment was made. *Id.* at *5. Therefore, the Court concluded that the donee had not clearly and convincingly established the elements of a gift. *Id.* Because no gift was found, the Court of Appeals reversed for the trial court to determine the amount of the excess contribution and the amount owed by other joint tenant. *Id.*

In the present case, the trial court found the facts of *Harris* "similar to the facts here" because both cases deal with a third party conveyance of property to the parties jointly, with one party paying more than his or her equitable share of the purchase money. At the same time, however, the trial court found this case different from *Harris* because this case involves additional evidence "apart from the deed" establishing that an *inter vivos* gift was made when the property was purchased. Again, we discern no error in the trial court's analysis and application of *Harris*.

The third case on which the parties rely is *Parker v. Lambert*, 206 S.W.3d 1 (Tenn. Ct. App. 2006). *Parker* involved a couple who undertook construction of a home and sought partition after their breakup. *Id.* at 2. The Court of Appeals explained that when jointly held property is sold, the sale proceeds are to be divided in accordance with the parties' rights as determined by the court, as the court has a statutory and inherent right to adjust the equities and settle claims between the parties. *Id.* at 4. The opinion contains a very detailed discussion of the principles governing contributions by cotenants for the preservation, maintenance, and improvement of property. *Id.* However, the term "gift" never appears in the opinion. In fact, *Lambert* distinguished *Rivkin*, stating that it did not involve "a claim for contribution." *Id.* *Rivkin* analyzed whether a gift was made.

The trial court included a detailed discussion of *Parker* as well but ultimately concluded that "the issues in the current case are not addressed in *Parker*." The trial court explained that an *inter vivos* gift was not at issue in *Parker*. The trial court reasoned that the *Parker* case focused on contributions for preservation, maintenance, and improvement after purchase, while this case requires consideration of intent at the time of purchase. The trial court noted that this case is about more than contributions after purchase. Thus, the trial court deemed the *Parker* analysis inapplicable. Because *Parker* does not analyze the issue of an *inter vivos* gift, which is alleged in this case, we agree with the trial court that its analysis is not particularly helpful here.[5]

The fourth and final partition case discussed by the parties and the trial court, and perhaps the most instructive for purposes of this appeal, is *Brewer v. Brewer*, No. M2010-00768-COA-R3-CV, 2011 WL 532267 (Tenn. Ct. App. Feb. 14, 2011). *Brewer* involved parties who divorced and then cohabited without remarrying. *Id.* at *1. The deed to the jointly owned property at issue, recorded at the time of the sale, transferred the property to both parties. *Id.* The man testified that he had the woman's name put on the deed to the property along with his so that in case he died, she would have a home for their grandchildren. *Id.* at *2. However, he denied that he intended to make a gift of the property. *Id.* This Court acknowledged that "[t]here is generally a presumption that joint tenants have equal interests, but a tenant who pays more than his or her share for the property may seek contribution to compensate him or her." *Id.* (citing *Harris*, 2006 WL 772007, at *3). However, the trial court had concluded that the man "made a gift" to the woman of a one-half interest in the property, and therefore, the proceeds of the sale should be divided equally. *Id.* at *3. We agreed with the finding of a gift, explaining, "The language of the deed is evidence of an intent to convey ownership, and the recording of the deed is evidence of delivery." *Id.* (citing *Rivkin*, 2001 WL 1077952, at

---

[5] Jacob does not challenge the trial court's characterization of his claim as one for contribution toward the purchase price, as opposed to one for contribution for post-purchase preservation, maintenance, or improvement of the property. In his brief on appeal, he describes his father's "right to seek contribution from [Lisa] due to his excess payment toward the purchase price of the subject property." Thus, we have analyzed his claim in the manner presented.

*11). Further, we explained that the donor's own testimony regarding his intent supported the finding of a gift because his desire for the woman to live with the grandchildren in the home after his death could only be accomplished if she was entitled to the property upon his death. *Id.* Thus, we found no error in the trial court's conclusion that he made a gift of a one-half interest in the property. *Id.* The Court went on to consider whether the man was entitled to compensation for excess contributions he made on subsequent maintenance and improvements to the property. *Id.* at *4.

In the case before us, the trial court found the circumstances most like those in *Rivkin* and *Brewer*. As in those cases, the trial court found clear and convincing evidence that the donor intended to gift a one-half ownership interest in the property. The trial court noted that it reached this conclusion, even after finding Lisa not credible, because her testimony regarding his intent was bolstered by other evidence. Specifically, the trial court referenced the fact that Randy pledged his bank account as collateral for the purchase of the home rather than utilizing traditional financing. The trial court noted that Randy could have obtained a mortgage or paid the balance in cash. The court also pointed out that Randy could have purchased the home without Lisa's involvement. Instead, he obtained a loan secured by collateral other than the house, and they both signed the purchasing documents and had the house titled to them jointly. The trial court noted that Randy executed his will shortly thereafter and directed Jacob to pay his debts upon his death, which included the one-year note secured by the savings account. As a result, Jacob paid the balance owed upon Randy's death as one his debts. The trial court reasoned that these circumstances supported a finding that Randy "intended that his son own the house equally with [Lisa]." Within its factual findings, the trial court also referenced the fact that Randy had a history of giving Lisa "large amounts of money without her asking." The trial court found that Randy told Lisa "that he would buy her a house and give her $5,000 a month if she would quit her job and care for him." The trial court found that Randy gave Lisa a budget and delegated to her the responsibility for identifying a suitable house. The trial court discussed the realtor's testimony about Lisa's involvement in the home search, her offer on the home subject to Randy's approval, and both parties' involvement in the closing. The trial court found that the realtor explained the transaction and that both Randy and Lisa "were aware that the deed conveyed the house to them jointly." Considering all the circumstances, the court found, "by clear and convincing evidence, that [Randy] intended to gift [Lisa] a one-half interest in the house when he purchased it."

On appeal, Jacob argues that the proof presented did not rise to the level of clear and convincing evidence of a gift and that doubts remain as to Randy's intent. In the absence of a gift, Jacob contends that the case should have been decided based on the principles governing cotenants' contribution toward the purchase price discussed in the four cases analyzed above.

"Clear and convincing evidence is evidence establishing that the facts asserted are

- 12 -

highly probable[.]" *In re Estate of Smallman*, 398 S.W.3d 134, 155 (Tenn. 2013). "'Evidence is clear and convincing when it leaves no serious or substantial doubt about the correctness of the conclusions drawn.'" *Hussey v. Woods*, 538 S.W.3d 476, 483 (Tenn. 2017) (quoting *Goff v. Elmo Greer & Sons Constr. Co.*, 297 S.W.3d 175, 187 (Tenn. 2009)). Clear and convincing evidence "'produces in a fact-finder's mind a firm belief or conviction regarding the truth of the facts sought to be established.'" *In re Addalyne S.*, 556 S.W.3d 774, 782 (Tenn. Ct. App. 2018) (quoting *In re M.J.B.*, 140 S.W.3d 643, 653 (Tenn. Ct. App. 2004)).

Having carefully reviewed the record, we agree with the trial court's conclusion that the evidence clearly and convincingly establishes a gift to Lisa of a one-half interest in the home. Simply put, "an inter vivos gift is established by delivery with an intention to give." *Union Planters Bank, N.A. v. Shepard*, No. W2002-01188-COA-R3-CV, 2003 WL 21729443, at *4 (Tenn. Ct. App. July 14, 2003). We conclude, from the totality of the circumstances, that Randy had the present intent to make a gift to Lisa of a one-half interest in the Thompson's Station property. Even though the trial court discredited Lisa's testimony, it nevertheless found that Randy told Lisa "that he would buy her a house . . . if she would quit her job and care for him." Randy had a long-established relationship with Lisa and a history of giving her large sums of money. "Donative intent may be established by showing the love and affection between the donor and donee." *In re Estate of Bligh*, 30 S.W.3d 319, 321 (Tenn. Ct. App. 2000). In addition, the realtor's testimony establishes that Randy allowed Lisa to take the lead in the home search, and his priority was for her to be happy with the home purchase.[6] She made an offer on the home contingent on his approval, and he approved the home the next day, signing a document which stated, "James Randall Dicus has approved the home and he and Lisa G Smith intend to proceed with the purchase of [the Thompson's Station property]." They attended the closing together and signed the documents as joint buyers. Randy obtained a personal loan secured by his savings account, rather than a mortgage, and directed his executor to pay his debts at his death. Jacob's own testimony establishes that Randy "thought that the way he did it with this loan was going to satisfy the way he wanted it to go."

The next element is delivery. "The effect of valid delivery is to place the gifted property under the control and dominion of the donee." *In re Estate of Garrett*, No. M1999-01282-COA-R3-CV, 2001 WL 1216994, at *10 (Tenn. Ct. App. Oct. 12, 2001). In the context of real property, the delivery requirement is met by delivery of the deed. *Id.* However, "[m]anual transfer of the deed is not necessary if the grantor intends for the deed to take effect without its physical transmission to the grantee." *Kilgore v. Kilgore*, No. M2006-00495-COA-R3-CV, 2007 WL 2254568, at *5 (Tenn. Ct. App. Aug. 1, 2007). "To be effective, the delivery must deprive the grantor of power to recall the deed, and delivery is complete only where the grantor has put the deed beyond his power

---

[6] We find no support for Jacob's assertion that the realtor "had a bias in favor of [Lisa]."

to revoke or reclaim it." *Estate of Atkinson v. Allied Fence & Imp. Co.*, 746 S.W.2d 709, 712 (Tenn. Ct. App. 1987).

Here, Randy executed the necessary documents and caused the deed to be recorded, evidencing delivery. *See Brewer*, 2011 WL 532267, at *3 ("the recording of the deed is evidence of delivery"). "The recording of a properly executed and acknowledged deed raises a presumption of delivery and acceptance." *Kilgore*, 2007 WL 2254568, at *5. In addition, after closing, Lisa moved into the home two weeks before Randy, indicating the exercise of dominion and control over the property. We conclude that the element of delivery was sufficiently proven.

In summary, despite the suspicious circumstances surrounding other transactions before Randy's death, and in spite of Lisa's lack of credibility, we have no serious or substantial doubt that Randy intended to gift a one-half interest in the Thompson's Station property to Lisa. We therefore affirm the trial court's decision to split the proceeds of the partition sale equally after accounting for the expenses addressed at trial.

## V. CONCLUSION

For the aforementioned reasons, we affirm the decision of the chancery court and remand for further proceedings. Costs of this appeal are taxed to the appellant, Jacob Dalton Dicus, individually, and as executor of the Estate of James Randall Dicus, for which execution may issue if necessary.

s/ Carma Dennis McGee
CARMA DENNIS MCGEE, JUDGE

- 14 -